IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| SAMUEL A.[1], | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Civil Action No. 7:21-CV-00551 |
| | ) |
| KILOLO KIJAKAZI, | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| | ) |
| **Defendant.** | ) |

**REPORT AND RECOMMENDATION**

Plaintiff Samuel A. ("Samuel") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Samuel alleges that the Administrative Law Judge ("ALJ") erred by failing to properly assess his mental and physical impairments and to assess his allegations regarding his symptoms.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 15) and **DENYING** Samuel's Motion for Summary Judgment (Dkt. 13).

**STANDARD OF REVIEW**

This court limits its review to a determination of whether substantial evidence supports the Commissioner's conclusion that Samuel failed to demonstrate that he was disabled under the

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

Act.[2] <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also <u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (quoting <u>Craig v. Chater</u>, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Samuel filed for DIB in February 2015, claiming that his disability began on February 9, 2011,[3] due to bilateral hip, knee, and elbow pain, status post multiple knee surgeries, bilateral carpal tunnel syndrome with pain and numbness, back pain, headaches, anxiety, panic disorder, and swelling in his right knee. R. 93–94, 107. Samuel's date last insured is June 30, 2020; thus, he must show that his disability began on or before this date and existed for twelve continuous

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[3] At the hearing before the ALJ, Samuel amended the alleged onset date to January 6, 2015. R. 36.

months to receive DIB. R. 639; 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied Samuel's applications at the initial and reconsideration levels of administrative review. R. 93–105, 107–118. On August 30, 2017, ALJ Thomas Erwin held a hearing to consider Samuel's claim for DIB. R. 36–63. On December 11, 2017, the ALJ entered his decision analyzing Samuel's claim under the familiar five-step process[4] and denying his claim for benefits.[5] R. 13–28. On December 26, 2018, the Appeals Council denied Samuel's appeal. R. 717–19. However, on April 1, 2020, Judge Conrad entered an order remanding the matter to the Commissioner based on "the ALJ's failure to properly account for Samuel's moderate impairment in concentration, persistence, or pace." R. 723–40. On January 20, 2021, the ALJ held another hearing to consider Samuel's claim for DIB. R. 665–88. Counsel represented Samuel at the hearing, which included testimony from vocational expert Mark Hileman. On February 9, 2021, the ALJ entered his decision analyzing Samuel's claim and again denying his claim for benefits. R. 638–56.

The ALJ found that Samuel suffered from the severe impairments of bilateral chondromalacia with degenerative joint disease of the right knee, carpel tunnel syndrome, vocal cord carcinoma with vocal cord reconstruction, lumbago, depression, and anxiety. R. 641. The ALJ found Samuel was mildly limited in the broad functional areas of understanding,

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[5] Samuel was 49 years old on his alleged amended onset date, making him a younger person under the Act. R. 654.

remembering, or applying information, and adapting and managing oneself. R. 642–43. The ALJ found Samuel was moderately limited in the broad functional areas of interacting with others and concentrating, persisting, or maintaining pace. R. 643.

The ALJ determined that Samuel's mental and physical impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 642. The ALJ specifically considered listing 1.04 (disorders of the spine), listing 1.02 (major dysfunction of a joint), listing 13.02 (soft tissue cancer of the head and neck), listing 12.04 (depression), and listing 12.06 (anxiety-related disorders).

The ALJ determined that Samuel retained the residual functional capacity ("RFC") to perform light work. R. 644. Samuel must sit for two hours a day. Id. He cannot use foot controls, kneel, crawl, or crouch, and cannot perform work with hazards or at unprotected heights. Id. Samuel can occasionally climb ramps and stairs, can frequently handle, and can have occasional exposure to extreme heat or cold, wetness, and humidity. Id. He can have no more than occasional interactions with others, including the public, co-workers, and supervisors. Id. Samuel cannot perform production rate or pace work, which the ALJ defined as "work on an assembly line that keeps moving and where if the worker slows down, it slows down the entire operation, or a job that has strict hourly or daily quotas." Id. The ALJ determined that Samuel had no past relevant work but could perform jobs that exist in significant numbers in the national economy, such as checker, router, addressing clerk, and printed circuit board touch-up cleaner. R. 654–55. Samuel appealed the ALJ's decision, and the Appeals Council denied his request for review on September 17, 2021. R. 628–32.

# ANALYSIS

Samuel alleges that the ALJ failed to properly assess both his mental impairments and his physical impairments and failed to consider his subjective evidence.

**A. Medical History Overview**

1. <u>Medical Treatment</u>

   a. Knee Impairments[6]

Samuel injured his right knee at work in February 2011, years prior to his amended onset date, and subsequently underwent multiple surgeries, injections, and physical therapy.[7] R. 397, 404–05, 457, 473, 478–88. By 2014, shortly prior his amended alleged onset date, Samuel reported to his treating doctor, Richard L. Wilson, M.D., that he was working two days a week, and engaging in some physical activity, including performing some of the physical labor building his home and hunting. R. 341–42, 345–47. Dr. Wilson characterized Samuel's knee pain as "chronic" and "intractable," and noted that Samuel was wearing his knee brace, and his knee pain was relatively stable. <u>Id.</u> On Samuel's alleged onset date in January 2015, he presented to orthopedic surgeon Joseph T. Moskal, M.D., with complaints of continued bilateral knee pain. R. 311. X-rays showed mild joint space narrowing, but with overall maintenance of joint space, and Dr. Moskal recommended continued home exercise and a low impact exercise routine. R. 314. In 2015 through 2020, Samuel followed up several times a year with Dr. Wilson, who

---

[6] Samuel also underwent surgery to excise a squamous cell carcinoma legion in September 2016. R. 420, 501. Additionally, Samuel was diagnosed with carpal tunnel syndrome in 2011 and referred to a hand specialist. R. 409. However, x-rays of his hand were unremarkable. R. 556. Samuel was also involved in a motor vehicle accident in 2014, and complained of low back pain. R. 560. He was diagnosed with low back pain syndrome, with occasional symptoms, in 2015. R. 314.

[7] The surgeries included a right knee arthroscopy and right knee open fresh osteochondral allograft to patella defect. Dr. Wilson wrote in February 2013 that Samuel "is essentially back at square one with these repetitive surgeries to the knee . . . I expect at this point that he will be a chronic pain patient for the rem[a]inder of his days and some of this from my perspective is due to the repetitive surgeries of dubious value in my opinion." R. 357.

generally noted that Samuel complained of pain and was taking pain medication, but was stable, and doing "relatively well" but with "good days and bad days." R. 340, 361–62, 379–85, 1088, 1095–97, 1106, 1110–15, 1129.

      b.  Mental Health

Samuel had been diagnosed with depression and anxiety prior to his alleged onset date; however, by June 2015, he had stopped using his psychiatric medication due to side effects. R. 366–67. His mental status exam in June 2015 with his family doctor showed anxious affect and mood, but intact attention, concentration and memory and fair insight and judgment. R. 367. At this appointment, his doctor started him on Zoloft. Id. His family doctor generally indicated that Samuel's depression and anxiety were chronic, but stable. R. 599, 606. At the January 2021 hearing before the ALJ, Samuel stated that he stopped taking his Zoloft, and his attorney denied any ongoing mental health treatment. R. 671.

2. Medical Opinions

In March and July 2015, respectively, state agency physicians Richard Surrusco, M.D., and Brian Strain, M.D., reviewed the record and found Samuel capable of a limited range of light work. R. 93–105, 107–17. The ALJ gave these opinions significant weight. R. 653. State agency psychologists Howard Leizer, Ph.D. and Eric Oritt, Ph.D., found Samuel had mild difficulties in maintaining social functioning and concentration, persistence, or pace, and no restrictions in activities of daily living or repeated episodes of decompensation. R. 100, 112. Accordingly, the state agency psychologists found Samuel's mental impairments were non-severe. Id. The ALJ gave these opinions some weight. R. 653. The ALJ reasoned that Samuel "has a more significant susceptibility to stressors, at least when not on Zoloft, but the record does not show impaired concentration." Id.

Throughout 2014, Samuel saw Lauren Penwell-Waines, LCP. Dr. Penwell-Waines gave Samuel a global assessment of function (GAF) score at each visit, which fluctuated from a low of 43 to a high of 51. R. 319 –21, 324, 326. In November 2014, Dr. Penwell-Waines assessed a GAF of 45, but indicated that Samuel's symptoms of anxiety and depression were decreasing. R. 321. The ALJ gave these scores little weight because the scores reflect a single point in time, not the 12-month period a claimant must be disabled under the Act. R. 653. Additionally, the ALJ reasoned that the scores "do not distinguish between severity of one's symptoms and functional impairment[.]" Id.

In a prior decision denying benefits dated December 12, 2014, the ALJ determined Samuel was capable of a limited range of light work. R. 74. The 2014 decision found Samuel's mental impairments were non-severe. R. 73. The ALJ gave this previous decision some weight. R. 654. The ALJ noted that the current record "indicates some, though not great changes." Id.

**B. Mental Impairments under SSR 96-8P**

Samuel argues that the ALJ failed to properly assess his mental impairments as required by SSR 96-8P.[8] See Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996). Specifically, Samuel asserts that the ALJ failed to explain how his RFC findings account for Samuel's moderate limitations in concentration, persistence, or pace, and in interacting with others. Pl.'s Br. at 25–26, Dkt. 14. Samuel further argues that because the ALJ did not consider his moderate limitations, the ALJ failed to ask the vocational expert proper hypothetical questions. Pl.'s Br. at 31, Dkt. 13. The Commissioner counters that

---

[8] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding on all components of the Social Security Administration. Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); 20 C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

7

the ALJ "engaged in a fulsome discussion of [Samuel]'s mental impairments and provided ample rationale for the limitations he assessed." Def.'s Br. at 5, Dkt. 16.

SSR 96-8P requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. Teague v. Astrue, No. 1:10-cv-2767, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011). The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8P at *7; Meadows v. Astrue, No. 5:11-cv-63, 2012 WL 3542536, at *8 (W.D. Va. Aug. 15, 2012) (citing Davis v. Astrue, No. 9-cv-2545, 2010 WL 5237850, at *5 (D. Md. Dec. 15, 2010)); Monroe, 826 F.3d at 189 (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often).

In Shinaberry v. Saul, the Fourth Circuit clarifies that an "ALJ cannot summarily 'account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work,' because 'the ability to perform simple tasks differs from the ability to stay on task.'" Shinaberry v. Saul, 952 F.3d 113, 121 (4th Cir. 2020) (quoting Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015)). However, Mascio does "not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." Id. In contrast, Shinaberry highlights "sister circuits" who conclude that "limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations [in concentration, persistence, or pace]" when the "medical evidence demonstrates that a claimant can engage in simple, routine

8

tasks, or unskilled work, despite [these] limitations." Id. (quoting Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011)). Shinaberry further confirms that Mascio does not broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace always translates into a limitation in the RFC, but instead underscores the ALJ's duty to adequately review the evidence and explain the decision. See also Monroe, 826 F.3d 176 (emphasizing that the ALJ must provide a sound basis for his ruling, including discussing what evidence he found credible and specifically applying the law to the record).

Here, the ALJ explained why Samuel's moderate limitations in concentration, persistence, or pace, and in interacting with others did not translate into a limitation in the RFC beyond that imposed.[9] Addressing Samuel's moderate limitations in concentration, persistence, or pace, the ALJ specifically acknowledged that Samuel has "some difficulty with stressors."[10] R. 643. However, the ALJ noted that Samuel did not have concentration impairment in his June 2015 evaluation, and later records indicate that his Zoloft controlled his psychological issues. Id. Although Samuel stopped taking Zoloft, he has not had any ongoing mental health treatment, and the ALJ noted that "[t]he later record indicates [Samuel] did not have significant difficulty with anxiety or depression even without medication." R. 643, 671. The ALJ also noted that "[t]he record does not show psychological abnormalities in examination" after August 2016. R. 652.

---

[9] Samuel also argues the ALJ "expressed [Samuel]'s RFC first and only then concluded the limitations caused by his impairments were consistent with that RFC." Pl.'s Br. at 30, Dkt. 14. However, this assertion is not supported by the record. The ALJ explicitly discussed Samuel's mild and moderate limitations in conjunction with his medical record. R. 642–43.

[10] Samuel argues that the ALJ incorrectly concludes "that stressors are the only reason [Samuel] cannot maintain focus." Pl.'s Br. at 26, Dkt. 14. This mischaracterizes the ALJ's decision. The ALJ did not state that stressors were the only reason Samuel cannot maintain focus. When the ALJ acknowledged Samuel's stressors, the ALJ specifically cited to the record where Samuel said that he would remove himself from stressful situations when he was anxious or irritable. R. 651 (citing R. 326). The record supports the ALJ's conclusion that stressors impact Samuel's concentration, persistence, or pace.

9

The ALJ specifically cited to notes in the record where providers found that Samuel had linear, logical thoughts and that his concentration was normal. R. 651–52.

Addressing Samuel's moderate limitation in interacting with others, the ALJ specifically acknowledged that Samuel "testified to mood swings as well as not trusting others" and that Samuel reported being irritable and defensive and yelling and cursing at family members. R. 643. Samuel argues that the ALJ "ignored the evidence of record documenting [his] irritability, which would interfere with his ability to interact with others[.]" Pl.'s Br. at 31, Dkt. 14. However, the ALJ noted that the record does not indicate that Samuel ever yelled or cursed at people outside his family. R. 643. The ALJ also noted that Samuel successfully coached a soccer team in the past, reconciled with his wife, and worked to remove himself from stressful situations. Id. Further, the ALJ pointed out that although Samuel "had irritation earlier in the record, [he] did not engage in violence." R. 652.

Contrary to Samuel's argument, the ALJ explained his reasoning and the RFC, including specific references to the medical records and opinions. The ALJ explained that because the record shows difficulty in concentration, persistence, or pace, and in interacting with others, Samuel has been limited to jobs with no production rate or pace work and no more than occasional interaction with others. R. 644.[11]

Samuel further asserts that because the ALJ did not consider his moderate limitations in concentration, persistence, or pace, and in interacting with others, the ALJ failed to "pose any hypothetical questions to the vocational expert that included these limitations." Pl.'s Br. at 31,

---

[11] Samuel argues that the ALJ failed to address his ability to sustain work over an eight-hour day. Pl.'s Br. at 27–28, Dkt. 14. The purpose of the RFC is to assess "an individual's ability to do sustained work-related physical and metal activities in a work setting on a regular and continuing basis" meaning "8 hours a day, for 5 days a week, or an equivalent work schedule." See 20 C.F.R. §§ 404.1545(b); SSR 96-8, 1996 WL 374184, at *1-2. Here, the ALJ determined that Samuel could perform sustained work activities in an ordinary work setting on a regular and continuing basis with certain limitations and accommodations. The ALJ provided a narrative discussion explaining his conclusions and the evidence supporting the RFC determination.

Dkt. 14. At the hearing, the ALJ asked the vocational expert, Mark Hileman, the following question:

> So if you can consider a hypothetical individual of the Claimant's age, education, and work history. If we do limit that individual to light work, within that try to follow the traditional definition[,] . . . eliminating production rate or pace work, which I'll define as having to keep up with an assembly line that's constantly moving, if you slow down it slows down the whole operation, or just in a different job that has strict hourly or daily quotas. You know almost all jobs have some type of performance requirement but there are jobs without strict quotas, whether it's phone calls, whether it's assembling something. Let's eliminate those. And no more than occasional interaction with others, public, coworkers, and supervisors. If we started there, would there be light work or sedentary work that would be appropriate?

R. 684 –85. "In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (internal citations omitted). Here, the ALJ based his hypothetical on the evidence in the record. As discussed, the ALJ acknowledged that the record indicated that Samuel had difficulty with concentration, persistence, or pace, and in interacting with others. Those limitations were addressed in the ALJ's hypothetical when asking for jobs that had no assembly lines or strict production quotas and limited interactions with others. The ALJ's hypothetical limitations were supported by the record and considered Samuel's impairments.

Samuel's assertion that the ALJ did not explain how the RFC findings address or accommodate his moderate limitations with concentration, persistence or pace, or interacting with others is unfounded. The ALJ provided a lengthy narrative discussion of Samuels's allegations, treatment records, and opinion evidence regarding his mental health limitations. The ALJ considered Samuel's allegations of difficulty being around people

11

and with concentration, persistence, and pace at length in his opinion. The ALJ explained how his RFC is supported by Samuel's mental health treatment records and carefully analyzed each facet of his mental impairments. Accordingly, I recommend finding that the ALJ's assessment of Samuel's impairments was sufficient under SSR 96-8P.

### C. Function-by Function-Analysis

Samuel argues that the ALJ did not make specific findings, as required by SSR 98-6P, regarding whether his impairments would limit his ability to sit, stand, lie down during the day, use his hands, or take breaks. Pl.'s Br. at 35, Dkt. 14. Samuel argues that the ALJ did not conduct a function-by-function analysis. Id. at 33. Samuel points to swelling in his legs after standing, the need to apply ice and elevate his legs throughout the day, his use of a cane and knee braces, his pain and numbness in his hands, and the need to lie down for most of the day. Id. The Commissioner counters that "the ALJ acknowledged each of [Samuel's] subjective complaints, but reasonably found that the evidence in the record did not support limitations to the degree alleged by [Samuel]." Def.'s Br. at 9, Dkt. 16.

The ALJ is required to develop an adequate RFC that accounts for the work activities the claimant can perform given the physical or mental impairments affecting his ability to work. Importantly, the ALJ must explain the conclusions reached and explain any record evidence which contradicts the RFC determination. See SSR 96-8P, 1996 WL 374184 (S.S.A. July 2, 1996). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8P, 1996 WL 374184, at *7.

In Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Mascio, 780 F.3d at 636 (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). "The Mascio Court held remand was necessary, in part, because the ALJ failed to indicate the weight given to two residual functional capacity assessments which contained relevant conflicting evidence regarding the claimant's weight lifting abilities." Newcomb v. Colvin, No. 2:14–CV–76, 2015 WL 1954541, at *3 (N.D. W. Va. Apr. 29, 2015).

Here, the ALJ properly explained how the RFC accounts for Samuel's physical impairments and provided the necessary medical and non-medical facts and evidence to support his conclusions. Addressing Samuel's ability to sit and stand, and his alleged need to lie down during the day and take breaks, the ALJ stated:

> The claimant's knee issues would cause difficulty performing on a full-time basis the window work he did before his right knee surgeries, but the record does not indicate his knee issues would limit him below the light level. The claimant testified to elevating his legs and applying ice three or four times a day, and using a TENS unit a couple times a day. The record does not show chronic lower extremity edema issues. The claimant reported he was using ice and heat with 'relative rest' when needed in November 2014, but this does not indicate he had to do this frequently at that time. The record does not show regular reports of this. He reported he was using a TENS unit in January 2015, but this was not a regular report either, though he saw a provider for his pain medication regularly.

R. 649. Further, the ALJ noted that Samuel testified to using a cane when walking long distances or standing long periods of time but concluded that "[t]he record does not indicate he generally used an assistive device." R. 642. The ALJ also considered the testimony of the state agency

13

doctors who gave Samuel a light exertional level and that Samuel's providers noted he "continued to be fairly active" and was stable at the end of the record. R. 649, 653.

Addressing Samuel's ability to handle, the ALJ noted that "[t]he record during the period at issue does not indicate significant carpal tunnel syndrome symptoms" or chronic hand complaints and that Samuel had full range of motion, intact strength, and full sensation. R. 642, 650. The ALJ further noted that the state agency doctors "found carpal tunnel syndrome severe but did not give manipulation limitations." R. 653. The ALJ found, however, that "a limitation on handling is appropriate as a precaution." Id.

Contrary to Samuel's contentions, the ALJ provided a detailed summary of Samuel's physical impairments, medical records, testimony, and opinion evidence. The ALJ was required to create a narrative discussion that builds "an accurate and logical bridge from the evidence to his conclusion," which the ALJ did in his discussion of the medical and non-medical evidence, Samuel's alleged symptoms, and the medical opinions of record. This narrative discussion allows this court to see how the evidence in the record—both medical and non-medical—supports the RFC determination. Because I was not "left to guess" at how the ALJ reached his RFC determination, I find that the ALJ's conclusion is supported by substantial evidence. Mascio, 780 F.3d at 637.

### D. Subjective Allegations

Samuel argues that the ALJ's assessment of his allegations is not supported by substantial evidence. Samuel claims that the ALJ "fail[ed] to acknowledge the extent of the activities described by [Samuel] and that he can only perform activities on an intermittent basis or not at all, cannot sit or stand very long, and has to lie down multiple times per day." Pl.'s Br. at 29,

14

Dkt. 14. The Commissioner counters that the ALJ followed the regulatory evaluation process. Def.'s Br. at 10, Dkt. 16.

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. Soc. Sec. Ruling 16-3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims, SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c). First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain.[12] Id. at *3, §§ 404.1529(b), 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. Id. §§ 404.1529(c), 416.929(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Id.

Here, the ALJ found that Samuel's medically determinable impairments could reasonably be expected to cause the alleged symptoms. R. 645. However, the ALJ found that Samuel's statements concerning the intensity, persistence, and limiting effects of those symptoms were not consistent with the record. Id. Samuel points to Brown v. Comm'r, 873 F.3d 251 (4th Cir. 2017)

---

[12] SSR 16-3p states that a claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms." Id. Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." Id.

and similar cases to support his argument that the ALJ failed to "acknowledge that the activities of [Samuel] he cited [such as coaching his son's sports team and installing windshields], are very limited and performed by [Samuel] on a very limited and intermittent basis." Pl.'s Br. at 40, Dkt. 14. Samuel further argues that "none of the activities cited by the ALJ undermine [Samuel]'s testimony and allegations that he is unable to maintain a static sedentary work posture over the course of an 8 hour workday." Id. Samuel emphasizes his testimony that he is unable to perform any household chores other than heating a meal in the microwave and that his father does 90% of the work involved with mowing Samuel's lawn. Id. at 39.[13]

The ALJ repeatedly acknowledged the pain that Samuel experiences, especially in his knees, and that doctors prescribed opioids to control Samuel's pain. R. 645–649. Further, unlike in Brown, the ALJ pointed to more than Samuel's daily activities to discount his subjective allegations.[14] Beyond the activities of daily living, the ALJ noted that medical evidence was inconsistent with Samuel's allegations about the extent of his impairments. R. 645. Samuel's allegations of disability were also inconsistent with the state agency doctors' opinions, who found that Samuel can perform work at a light exertional level. R. 653. The ALJ also noted that Samuel's "reports overall do not indicate he has been highly limited" and "his reports indicate significant activity." R. 648–49. Finally, the ALJ may properly rely on evidence regarding a plaintiff's routine, non-work activities in rejecting a claim of disability. See Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005).

---

[13] Samuel also notes that although the ALJ says that Samuel coached his son's sports team, he only helped out with practices and did not coach because he was unable to stand long enough. Pl.'s Br. at 37, Dkt. 14. However, as the Commissioner notes, the record indicates that Samuel told his providers that he coached his son's sports teams. R. 382, 623. I agree with the Commissioner that "[t]he ALJ was not bound to credit [Samuel]'s later explanations over his contemporaneous reports to doctors." Def.'s Br. at 11, Dkt. 16.

[14] Also, unlike in Brown, the ALJ here did not fail to consider any doctor's opinions, or wrongly credit a psychiatric medical expert's testimony over the "consistent opinions of [five] treating and examining sources" who found disabling physical limitations. Brown, 873 F.3d at 266.

It is for the ALJ to determine the facts of a particular case and to resolve inconsistencies between a claimant's alleged impairments and his ability to work.  See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); see also Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). The ALJ's opinion was thorough and applied the proper legal standard, and I will not re-weigh the evidence. Accordingly, I conclude that the ALJ supported his analysis of Samuel's subjective complaints with substantial evidence, and that Samuel is capable of performing work at the level stated in the ALJ's opinion.

## CONCLUSION

It is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The clerk is directed to transmit the record in this case to Michael F. Urbanski, Chief United States District Judge, and to provide copies of this Report and Recommendation to counsel of record.  Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days.  Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection, including the waiver of the right to appeal.

Entered: January 6, 2023

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge